**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **ELLIOT N. WILLIAMS** | § | **CIVIL ACTION NO. 2:20-cv-00277** |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MCDERMOTT INTERNATIONAL,** | § | |
| **INC. and CB&I, LLC** | § | |
| *Defendant* | § | |
| | § | **JURY DEMAND HEREIN** |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

**NOW COMES** Plaintiff, **ELLIOT N. WILLIAMS,** through undersigned counsel, who files his Original Complaint against Defendants, **MCDERMOTT INTERNATIONAL, INC. and CB&I, LLC**. He hereby states as follows:

---

**JURISDICTION AND VENUE**

---

1. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964 as it appears at 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981.

2. This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, law or treaties of the United States;

   b. 28 U.S.C. § 1343 (3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government;

3.  Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) prior to instituting action (Charge No. 461-2017-00050).

4.  The EEOC issued its "Notice of Right to Sue (Conciliation Failure)" on December 5, 2019. *See* Exhibit A. Plaintiff is afforded 90 days from his receipt of such Notice to commence suit, and the date of this filing is within the statutory period.

5.  Venue is appropriate in this judicial district under 28 U.S.C. § 1391 (b) because the events that gave rise to this Complaint occurred in the Western District of Louisiana, specifically in Cameron Parish, making the Lake Charles Division the most appropriate Division for this suit.

**PARTIES**

6.  Plaintiff is a citizen of the United States and resides in the City of Darrow, State of Louisiana.

7.  Plaintiff is African American and, as such, is a member of a protected class.

8.  At all times relevant to this suit, Plaintiff worked as a Journeyman Rigger for CB&I, LLC at its location in Hackberry, Louisiana.

9.  Defendant, **CB&I, LLC** ("CB&I"), is a municipal limited liability company licensed to conduct and conducting business in the State of Louisiana. The acts complained of in this Complaint occurred in Calcasieu Parish, State of Louisiana, where CB&I performs a significant amount of business. At all times relevant to Plaintiff's employment, CB&I was Plaintiff's acting employer. Upon information and belief, MCDERMOTT

INTERNATIONAL, INC. has acquired CB&I in recent acquisition proceedings, and therefore acquired and bears responsibility for all CB&I legal liabilities.

10. Defendant, **MCDERMOTT INTERNATIONAL, INC.** ("MCDERMOTT"), is a municipal corporation licensed to conduct and conducting business in the State of Louisiana. The acts complained of in Plaintiff's Complaint occurred in Calcasieu Parish, State of Louisiana, where McDermott performs a significant amount of business. As set forth in Paragraph 9, upon information and belief, MCDERMOTT has assumed and therefore bears responsibility for any and all CB&I legal liabilities.

## FACTUAL ALLEGATIONS

11. On or about June 2, 2016, Plaintiff began his employment with Defendant CB&I as Journeyman Rigger at its facility located in Hackberry, Louisiana.

12. Plaintiff was initially assigned to a crew situated in CB&I's Area 411 "laydown yard," which later became known as Train 3. Plaintiff's crew consisted of himself, along with four (4) other members: 1) Jesus Govea (Hispanic, Rigger); 2) Kenneth Monroe (African American, Rigger); 3) Jerry Vincent (Caucasian, Rigger); and 4) Lawrence Adams (Caucasian, Crane Operator).

13. From the very first day that Plaintiff arrived at his worksite in the laydown yard, Plaintiff was exposed to the severe and utterly pervasive discriminatory behavior of another rigger on his crew, Jerry Vincent ("Vincent") (Caucasian).

14. Vincent racially profiled Plaintiff and other crew members on the basis of their protected characteristics: African-American and/or Hispanic.

15. Any time one of the other crew members would walk past Vincent, Vincent would make a racist comment, depending on which employee walked by.

16. If Jesus Govea ("Mr. Govea"), who was Hispanic, walked into the area, Vincent would make remarks to the effect of "go swim back across the river" and consistently called him a "wetback." Additionally, Plaintiff witnessed Vincent ask Mr. Govea, "did the Mexicans at the food camp leave any food for the brothers? You know they don't get food stamps there."

17. If it was either Kenneth Monroe ("Mr. Monroe") or Plaintiff, Vincent would make jokes about "watermelons," "chicken," and other items associated derogatorily with African Americans. He also made comments to the effect of, "I can't stand N******" or would refer to other employees as "those damn N******" in the direct presence of Mr. Williams, Mr. Monroe, and Mr. Govea.

18. Vincent also made pervasive, continued, and egregiously offensive references to "welfare," always implying that Mr. Monroe and Plaintiff, because they were African-American, necessarily had to be on welfare.

19. On several occasions, Vincent said that, "Blacks are great at the 'game' of getting government assistance" as though all African Americans are poor. Additionally, on numerous occasions, Vincent made comments along the lines of "I need somebody white back here," because he was the only Caucasian rigger on the crew.

20. On several occasions, the crew told Vincent to stop and that, "enough is enough" with the incessant and derogatory commentary. In response, Vincent laughed and stated, "[d]on't make me call Paul, because you know I will."

21. At the time, Paul Williams served as Foreman, and he and Vincent were extremely close friends. As such, Vincent, and his close relationship with Paul Williams, made Plaintiff and his crewmembers fear for their job should they "open their mouth."

22. Plaintiff realized, almost immediately, that CB&I was acquiescing in Vincent's behavior, as Vincent would make these derogatory statements in morning safety meetings, in which several crews were present. The General Foreman, Paul Williams, bore witness to these pervasive comments and simply laughed as though he was amused by them.

23. At no point in time did Paul Williams ever instruct Vincent that the behavior was offensive and entirely inappropriate. Although Paul Williams is African-American, he acted as though he enjoyed Vincent's racially demeaning jokes and verbal attacks on his fellow-employees.

24.  When Plaintiff arrived on-site, he was informed by his Foreman, James Dever, "don't worry about Paul, he don't like black people."

25. CB&I, through its agents and employees, tolerated or otherwise permitted and, at times, even encouraged this kind of inappropriate conversation to continue.

26. Because Plaintiff had just started the job, he tried his best to remove himself from the environment in lieu of complaining to management and painting a figurative target on his back. As soon as Vincent would start making derogatory comments toward either he, Mr. Monroe, or Mr. Govea, Plaintiff would deliberately walk away from the area.

27. As the new employee, Plaintiff turned to Mr. Govea and Mr. Monroe, two employees that had been employed by CB&I for a longer period of time. When Plaintiff asked, "what's up with this guy? Why's he acting like that," he was told, "that's just the way it is. Let it go."

28. Because Plaintiff needed to retain his position with the company to maintain financial stability, he bit his tongue and kept his complaints among he, Mr. Monroe, and Mr. Govea, as they played witness to each incident of Vincent's deplorable discrimination.

29. Initially, Plaintiff was hesitant to formally complain, because he knew that those employees who complain about harassment/discrimination were almost always retaliated against and that there "would be all kinds of trouble."

30. On July 21, 2016, Mr. Govea, who had been with CB&I longer than Plaintiff, insistent that he wanted to report Vincent, as the conduct had to be stopped. Mr. Govea asked Plaintiff, "If I report this, will you back me up?" to which Mr. Williams responded that he would. Ultimately, the two men decided that Kenneth Monroe should also be involved in any conversation pertaining to the discrimination exhibited by Vincent; however, Mr. Monroe was not working that day and so the decision was made to speak to supervision the following day.

31. During the morning meeting on July 21, 2016, Vincent made an exceptionally discriminatory remark about a Hispanic employee. While Mr. Govea and Plaintiff wanted to wait until Mr. Monroe was back on-site so he could be involved, Vincent's racial epithet was so entirely inappropriate that Mr. Govea and Plaintiff decided to proceed even in Mr. Monroe's absence.

32. On or about July 21, 2016, Mr. Williams and Mr. Govea approached their newly appointed Foreman, James Dever, at which time they relayed their concerns with the severe and pervasive discriminatory treatment Vincent had been exhibiting in the workplace.

33. Paul Williams had recently been promoted to General Foreman. As such, Plaintiff and Mr. Govea now had a new direct supervisor – one to which they felt safer reporting.

34. After informing Mr. Dever about Vincent's conduct, Mr. Govea and Plaintiff stated, "you have to do something about this, please help us." In response, Mr. Dever stated that he would talk to Vincent and that Mr. Govea and Plaintiff could go back to work because he (Dever) "would handle it."

35. A couple of days later, Plaintiff had to attend a two-day rigging safety class elsewhere on the CB&I site. Plaintiff was thankful for the opportunity to escape the hostilities involved in his typical work area for a couple of days.

36. On the last day of class, James Dever came in to the classroom and asked to see Plaintiff outside. At that time, Dever stated, "hey man, you need to write a statement on the stuff Jerry was saying."

37. At first, Plaintiff stated that he did not want to write a formal statement, as he was sure that, once HR got involved, he would be retaliated against. In response, Dever stated, "look man, I got Ken and Jesus to write a statement, I need you to write one also." While Plaintiff was still hesitant, he informed Dever, "You know what, I have to take a test, give me the paperwork and I'll write the statement." When Plaintiff finished his test, he took a few minutes to write a statement; however, he did not want to submit it to Dever until after he had the chance to speak to Mr. Monroe and Mr. Govea.

38. As Plaintiff stepped on to the bus to leave the site after his examination, James Dever located the bus and came to ask Plaintiff whether he had finished his statement. At that time, Plaintiff simply handed the statement to Dever, who then told him he'd be delivering the statements to the administrative office.

39. Almost immediately after he submitted his statement to Dever, Plaintiff noticed a change in his work environment. For example, there existed a large stack of rebar that had been

sitting in the same position on-site for quite some time. The next day, Paul Williams came over and made Plaintiff, Mr. Govea, and Mr. Monroe move the entire stack of rebar without any explanation other than, "because I want it moved." Paul Williams then began assigning Plaintiff, Mr. Monroe, and Mr. Govea to menial tasks. Williams also started coming around the crew's worksite a lot more frequently than in the past, and he would consistently glare at the crew or find something menial to yell at or otherwise reprimand the crew for.

40. Shortly after Dever had obtained and submitted Plaintiff's witness statement, Plaintiff, along with Mr. Govea and Mr. Monroe, were using a crane to load rebar on to a trailer for transport. Paul Williams sent over a group of several individuals, including Boo Murray, the Superintendent, to take pictures and video footage of the crew completing their task. Almost immediately after the group of spectators left, Plaintiff and his crew were called into the office, wherein an individual (a male with a strong Australian-sounding accent), stated that they were being written up for failing to use two taglines when loading the rebar.

41. Notably, Plaintiff and his crew followed proper protocol and had utilized two taglines as required; however, the picture shown to him did not indicate that the taglines had been used. As soon as the individual was notified that the proper taglines had been used, the individual began apologizing for the miscommunication and mistake.

42. After the individual left, Boo Murray called Plaintiff, Mr. Govea, and Mr. Monroe in to the office, separately, to discuss the perceived "incident." At this time, Murray informed Plaintiff that he was still intending to write Plaintiff up for "failing to use two taglines," despite the fact that he was shown direct proof that two taglines had been used. In response, Murray stated, "listen, I can make this all go away" and that "we don't need to take this any further about going to HR."

43. Effectively, Murray told Plaintiff that he would not write him up (for an incident that did not occur anyway) so long as Plaintiff promised that he would not go to HR. Accordingly, Plaintiff was put on notice that, should he attempt to go to HR for any reason, that write ups would result.

44. Thereafter, CB&I deliberately separated Plaintiff, Mr. Govea, and Mr. Monroe so that neither of them remained on the same crew.

45. Plaintiff was transferred, without justification or any explanation, to more than five (5) different crews throughout the remainder of his employment. He was constantly referred to as a "rat." On one occasion, an African American employee (name unknown), approached Plaintiff and verbally refused to help the crew perform work. The employee stated, "I don't want to be here, I don't want y'all ratting on me too, like you're doing Paul."

46. For the next several months, and almost on a daily basis, Paul Williams engaged in a series of "scare tactics," or conduct and actions intended to intimidate the crew and place them in imminent fear of termination in retaliation for reporting Vincent. For example, Williams would ride by and make statements to the effect of "you're absolute scum of the earth because you went to HR." He consistently stated, "I'm going to get your ass fired," "you're not gunna make it through this week," and "you're still here? I'm going to get rid of you."

47. As a result of the "scare tactics" employed by Williams, Plaintiff became concerned that CB&I personnel had placed him under a microscope so that they could fire him the very second he made any mistake.

48. The behavior exhibited by Paul Williams ultimately caused Jesus Govea to resign in August 2016, as Govea could no longer perform his duties due to the severe and pervasive hostile work environment to which he had been subjected.

49. At one point, Plaintiff approached Human Resources in an attempt to save his job and request a transfer. At this point, he felt like he was being targeted for termination and wanted to see if there was anything he could do to escape the hostile environment to which he was continuously subjected.

50. Before Plaintiff even reached the HR office door, Boo Murray stormed up to Plaintiff and screamed, "why the hell are you up here?" He then proceeded to tell Plaintiff that Plaintiff could only come to HR if he brought his General Foreman, which was Paul Williams, the alleged retaliator.

51. CB&I denied Plaintiff's transfer request.

52. In approximately September 2016, and as a result of the ever-increasing hostile and stressful environment, Plaintiff sought medical treatment at the VA Hospital. He met with a psychiatrist approximately five (5) times, and each time, Plaintiff relayed the constant harassment and treatment he was receiving as a result of the witness statement had had submitted.

53. At one point, the psychiatrist attempted to help Plaintiff secure another job, telling Plaintiff that if the job was truly upsetting him that much, that, "you have to get yourself out of that environment." Furthermore, the psychiatrist prescribed Plaintiff sleep medication with the hopes that he would be able to calm down so that he could eat and sleep more regularly.

54. Ultimately, because the pervasive harassment continued, Plaintiff had no choice but to formally resign from his position with CB&I on or about October 1, 2016.

55. Plaintiff contacted CB&I's human resources department to request the proper email address so that he could submit the document to them via email; however, Plaintiff was given an improper email address so that the email would not go through.

56. Subsequently, Plaintiff printed out his statement and placed a copy in the HR mailbox, indicating that he had attempted to email it in but could not do so due to receipt of the improper address.

57. While Plaintiff needed the job to maintain financial stability, the environment had become so hostile and intolerable that Plaintiff could no longer perform the functions of his job under those conditions.

---

### FIRST CAUSE OF ACTION:
### RACIAL DISCRIMINATION (HOSTILE WORK ENVIRONMENT) IN EMPLOYMENT
*Pursuant to 42 U.S.C. 2000e et seq.*

---

58. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

59. Under Title VII, it is an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C.S. § 2000e-2(a)(1).

60. Defendant is an "employer" subject to the provisions of Title VII. At all relevant times, CB&I was an entity engaged in an industry affecting commerce who had fifteen or more employees defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees. . . ." 42 U.S.C. § 2000e(b).

61. Plaintiff is African-American and is therefore a member of a protected class.

62. Plaintiff was qualified for his position as a Journeyman Rigger. Not only did Defendant specifically hire Plaintiff for the position, but Plaintiff was able to perform all functions of his job.

63. Plaintiff was constructively discharged from his employment on October 1, 2016. As such, Plaintiff suffered an adverse employment action for purposes of establishing a Title VII claim.

64. Upon good information and belief, based on disparate treatment, Plaintiff alleges that he was subjected to unlawful discrimination on the basis of his race. As set forth in the preceding paragraphs, Plaintiff, Mr. Monroe, and Mr. Govea witnessed Jerry Vincent racially profile them on the basis of their race and make disparaging comments on an almost daily and recurrent basis. Plaintiff could not walk in to his work area without Jerry Vincent making some racially charged, derogatory comment.

65. The harassment Plaintiff suffered was based on his race. The alleged harassment dealt specifically with Plaintiff's status as an African-American, including, but not limited to: 1) comments regarding an apparent distaste for "N******"; 2) consistent reference to African-Americans as "brothers"; 3) comments to the effect of "Blacks are great at the 'game' of getting government assistance"; 4) constant, offensive  references to welfare or food stamps; 5) constant racial profiling and talking about "watermelons" or "fried chicken"; and 6) consistent comments stating, "I need more white people out here."

66. Jerry Vincent subjected Plaintiff, Mr. Monroe, and Mr. Govea to severe and pervasive ridicule, insult, and mental distress by his repeated use of racial profiling and racial epithets in the workplace.

67. Vincent's conduct was subjectively offensive to Plaintiff, and, as made apparent by the other witness statements, was objectively offensive to other employees.

68. In fact, a Caucasian employee wrote a statement verifying the hostile work environment to which Plaintiff and his fellow co-workers had been subjected by Jerry Vincent.

69. CB&I, through its agents and employees, were well aware of Vincent's discriminatory conduct long before any remedial action was purportedly taken. Vincent made pervasive, continuous racial slurs and epithets during morning meetings, at which Paul Williams, the General Foreman, and oftentimes Boo Murray, the Superintendent were present. Notably, rather than addressing Vincent and telling him to stop immediately, Paul Williams would oftentimes laugh and ask Vincent to repeat his comment because he thought it was funny. Boo Murray simply laughed or otherwise acquiesced in the discriminatory ridicule.

70. For several months, Paul Williams served as the Foreman over Plaintiff's crew. Because Vincent and Paul Williams had such a friendly relationship, no complaint to Paul Williams was ever addressed, but was instead entirely ignored. In fact, when Plaintiff and his crewmembers attempted to tell Vincent, "enough is enough," Vincent simply replied, "Don't make me call Paul, because you know I will."

71. It was not until James Dever became Foreman that any remedial action was purportedly taken, after Mr. Dever listened to his employees concerns, had them write formal statements, and submitted them to the CB&I administrative office.

72. Vincent's behavior persisted for several months, in the presence of a General Foreman and Superintendent, with no effort by CB&I to stop or otherwise address the behavior.

73. Plaintiff's race, African-American, was a determining factor in treating Plaintiff less favorably than Caucasian employees.

74. Plaintiff opposed what he perceived to be discriminatory treatment on the basis of his race. CB&I did absolutely nothing to rectify the situation.

75. Wherefore Plaintiff asks this Honorable Court to find **CB&I, LLC** liable for the violation of Title VII of the Civil Rights Act of 1964.

---

**SECOND CAUSE OF ACTION:**
**RACIAL DISCRIMINATION IN EMPLOYMENT**
*Pursuant to 42 U.S.C. 2000e et seq.*

---

76. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

77. Under Title VII, it is an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C.S. § 2000e-2(a)(1).

78. Defendant is an "employer" subject to the provisions of Title VII. At all relevant times, CB&I was an entity engaged in an industry affecting commerce who had fifteen or more employees defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees. . . ." 42 U.S.C. § 2000e(b).

79. Plaintiff is African-American and is therefore a member of a protected class.

80. Plaintiff was qualified for his position as a Journeyman Rigger. Not only did Defendant specifically hire Plaintiff for the position, but Plaintiff was able to perform all functions of his job.

81. Vincent's consistent, discriminatory treatment of Plaintiff and the failure of CB&I – through Paul Williams and Boo Murray – to take any meaningful action created a pervasive discrimination that forced Plaintiff to leave his employment.

82. Plaintiff, along with his co-workers, spoke to the perpetrator himself and to supervisors to have CB&I take remedial action to alleviate the long-standing workplace discrimination. After several months, and only after a new Foreman was appointed who would actually listen to employee concerns, did any purported remedial action occur.

83. Plaintiff was constructively discharged from his employment on October 1, 2016. As such, Plaintiff suffered an adverse employment action for purposes of establishing a Title VII claim.

84. Upon good information and belief, based on disparate treatment, Plaintiff alleges that he was subjected to unlawful discrimination on the basis of his race. By virtue of the discriminatory conduct alleged, Plaintiff was treated differently from Caucasian co-workers. At no time did Jerry Vincent ever call Caucasian employees derogatory names, including "N*****", or ever reference welfare or other government assistance. Furthermore, Plaintiff alleges that he was subjected to a hostile work environment on the basis of being subjected to severe and pervasive conduct based solely on his status as an African American.

85. Plaintiff's race, African-American, was a determining factor in treating Plaintiff less favorably than Caucasian employees.

86. Plaintiff opposed what he perceived to be discriminatory treatment on the basis of his race. CB&I did absolutely nothing to rectify the situation.

87. Wherefore Plaintiff asks this Honorable Court to find **CB&I, LLC** liable for the violation of Title VII of the Civil Rights Act of 1964.


*{Remainder of Page Intentionally Left Blank}*

## THIRD CAUSE OF ACTION:
## RETALIATION
### *Pursuant to 42 U.S.C. § 2000e-3(a)*

88. Plaintiff incorporates and reinstates each of the above paragraphs as if fully set forth herein.

89. Title VII makes it an unlawful employment practice for a person covered by the Act to discriminate against an individual "because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

90. Plaintiff, along with his co-worker, Jesus Govea, directly approached their Foreman, James Dever in approximately July 2016 to inform him of Jerry Vincent's pervasive use of racial slurs on the worksite, despite repeated requests that he not do so.

91. Additionally, Plaintiff submitted a formal witness statement to CB&I on or about July 21, 2016, indicating that he, along with his other co-workers, had been subjected to severe and pervasive discriminatory comments of Jerry Vincent.

92. Plaintiff was deliberately asked by his Foreman, James Dever, to submit a witness statement attesting to the information he and Mr. Govea had relayed to Mr. Dever in their previous conversation.

93. On at least one other occasion, Plaintiff approached HR to request transfer to another section of the facility. This request was denied, and Plaintiff stated as much in his resignation letter.

94. Plaintiff spoke to someone in an effort transfer away from the hostility to which he had been subjected and admittedly attributed his constructive discharge, at least in part, to CB&I's overt refusal to remedy or even address the situation.

95. Plaintiff's opposition to what he perceived to be workplace discrimination on the basis of race constitutes protected activity pursuant to Title VII.

96. Paul Williams and Boo Murray attempted to issue Plaintiff, Mr. Monroe, and Govea reprimands for failing to "use two taglines" after the crew produced evidence that they had done exactly what they were supposed to.

97. At this time, Murray informed Plaintiff that he was still intending to write Plaintiff up for "failing to use two taglines," despite the fact that he was shown direct proof that two taglines had been used.

98. In response, Murray stated, "listen, I can make this all go away" and that "we don't need to take this any further about going to HR." Effectively, Murray told Plaintiff that he would not write him up (for an incident that did not occur anyway) so long as Plaintiff promised that he would not go to HR. Effectively, Plaintiff was put on notice that, should he attempt to go to HR for any reason, that write ups would result. Ultimately, Plaintiff was given a Hobson's choice: 1) go to HR and complain and receive a pattern of unwarranted and illegitimate write ups to pad his record for termination or 2) be prevented from speaking to Human Resources about conduct violative of Title VII so that he could keep his job.

99. The retaliation culminated on October 1, 2016, at which time Plaintiff was constructively discharged.

100.      As set forth above, Defendant, through its agents, supervisors and/or employees, in a continuing course of conduct, subjected Plaintiff to retaliation and discrimination in the

terms, conditions, and privileges of his employment in retaliation for him opposing what he believed to be unlawful conduct on various occasions.

101.     Defendant failed to act in accordance with 42 U.S.C. § 2000e-3(a).

102.     Defendant's retaliation is willful, intentional, and committed with malice or reckless indifference to the protected rights of Plaintiff.

103.     As a result of Defendant's discriminatory conduct, Plaintiff has suffered non-pecuniary losses including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses to be more fully developed at the trial on this matter.

104.     Wherefore Plaintiff asks this Honorable Court to find Defendant, **CB&I, LLC,** liable for the violation of 42 U.S.C. § 2000e-3(a).

---

## FOURTH CAUSE OF ACTION:
*Violation of 42 U.S.C. § 1981*

---

105.     Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

106.     42 U.S.C. § 1981 protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts without respect to race. 42 U.S.C.S. § 1981(a). The statute currently defines "make and enforce contracts" to include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.S. § 1981(b). 42 U.S.C.S. § 1981 ensures that all persons have the same right to make and enforce contracts, including the making, performance, modification, and termination of employment contracts. 42 U.S.C.S. § 1981.

107.        Plaintiff incorporates the contents of Paragraphs 1-104 by reference, as Title VII and § 1981 claims are analyzed under the same evidentiary standards.

108.        Wherefore, Plaintiff asks this Honorable Court to find that, under 42 U.S.C. 1981, Defendants, CB&I, LLC and McDermott International, Inc., liable for depriving Plaintiff, Elliot N. Williams of rights, privileges, or immunities secured by the Constitution and law.

## PRAYER

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendant providing the following relief:

(a) All damages to which Plaintiff may be entitled, including but not limited to back pay, reimbursement for lost position and training, social security and other benefits, front pay, and any and all statutory relief;

(b) Punitive or exemplary damages;

(c) Reasonable attorney's fees, with conditional awards in the event of appeal;

(d) Pre-judgment interest at the highest rate permitted by law;

(e) Post-judgment interest from the judgment until paid at the highest rate permitted by law;

(f) Costs, including expert fees;

(g) Reasonable and necessary medical care and expenses in the past and future;

(h) Mental anguish damages in the past and future;

(i) Injunctive relief; and

(j) Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

---

## DEMAND FOR JURY TRIAL

---

Pursuant to Rule 38 of Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

**Respectfully Submitted**,

**SUDDUTH & ASSOCIATES, LLC**
Attorneys-at-Law
1109 Pithon St.
Lake Charles, Louisiana 70601
Tel: (337) 480 - 0101
Fax: (337) 419 - 0507
Email: *james@saa.legal*

**BY:** */s/ James E. Sudduth, III*
 **JAMES E. SUDDUTH, III, #35340**
 **KOURTNEY L. KECH, #37745**
 **PIERCE A. RAPIN, #38579**
 *Counsel for Plaintiff*